[No. 21340. Department Two. January 31, 1929.]

THOMAS BOGGESS, *by his Guardian ad litem Charles
Boggess, Plaintiff-Respondent,* v. KING COUNTY,
*Defendant-Appellant,* F. G. BRONSON,
*et al., Defendants.*[1]

[1]Reported in 274 Pac. 188.

*Ewing D. Colvin* and *Arthur M. Hare,* for appellant.

*Stanley J. Padden, G. F. Ward,* and *John J. Sullivan,* for respondent.

HOLCOMB, J.—Although the facts in this case are not in dispute, an exposition of the material facts upon which the case was decided by the judge and jury is in order.

King county entered into a written contract with F. G. Bronson and George Theusen, copartners, for labor and materials in the excavation, grading and construction of a county highway known as 35th avenue northeast, just north of the city limits of Seattle, which was at the time a regularly travelled street or public way. A considerable number of people lived in the vicinity of the highway under construction, had regularly used it, and the contractors, with the county, were required to keep the highway open for use.

Part of the construction work consisted of widening the right of way, and it was necessary to remove stumps and to loosen hardpan earth by blasting with dynamite. Dynamite was commonly used in such construction work and had been for a number of years, and such use was contemplated when making the contract. The work was done under the inspection of a deputy county engineer.

Material portions of the contract are referred to by appellant in an abridged form, which we shall further abridge. One of them is that the contractor

". . . will be held responsible for the faithful execution of the work in accordance with the specifications,"

and the engineer or his appointee, before the final acceptance, or before final payment, should require defective work or materials to be removed and replaced.

Another provision is that the successful bidder should satisfy the board of commissioners, before the contract was awarded to him, that he had, or would promptly provide, suitable men and tools and machinery for each of the different kinds of work. There was a stipulation that the contractor should give his personal attention to the faithful prosecution of the work. There was a provision regarding the contractor that, when not present on the work, orders should be given by the engineer to a superintendent or overseer, and if any person employed on the work should appear to be incompetent, disorderly or unfaithful, he should, upon the requisition of the engineer, be at once discharged and not again employed.

There is an agreement that:

"The contractor agrees to assume all risks and liabilities for accidents or damage that may accrue to persons or property during the prosecution of the work under these specifications, by reason of the negligence or carelessness of himself, his agents or employees."

There are certain specific covenants, among other things, prescribing that the contractor should provide sufficient safe and proper facilities at all times for the inspection of the work by the board or its authorized representative.

Another is that the contractor shall give his personal attention to the work at all times and be present, either in person or by duly authorized representative, on the site of the work continually during its progress, and shall receive instructions from the engineer in charge as agent of the board. Then follows this provision:

"The contractor shall be liable for all damages and injury which shall be caused or which shall occur to any person or persons or property whatsoever by reason of any negligence of said contractor or any of

his servants, employees or sub-contractors, or by reason of any breach or violation of any of the provisions of this agreement or any of its duties or obligations thereunder. . . ."

At about four-thirty p. m., October 13, 1925, one Nelson, employed by the contractors as a tractor-man, who had been blasting during the day with dynamite, gathered up what blasting material was left after the day's work was done, rolled it up in a gunny sack and placed it in a concrete tile at the intersection of the new highway and East 73rd street. The county inspector was not then present, the day's work being over, and most of the contractors' employees had left the work.

Previous to that day, for a week or ten days, several of these concrete tile pipes had been lying on the ground in the same place. They were about twelve inches in diameter, big enough for a child to crawl into, and the boy in question, and other children of the neighborhood, had been seen crawling through the pipes on several different occasions. The concrete tile, in which the gunny sack containing the dynamite and caps was left, was near the part of the highway used as a sidewalk by the residents of that neighborhood, and opened out toward the sidewalk or path. The inside of the pipe was easily visible to passersby.

The path adjacent to which these concrete tiles lay was the only road sidewalk for the children and all the people of the neighborhood to use in going towards the city and to the public school a few blocks to the south. The children of the neighborhood were in the habit of congregating on the corner of the intersection where these pipes were, playing hide-and-go-seek in the pipes, and playing along the road.

Mr. Meek, a deputy county engineer, who was the only inspector on the works, was well aware of these

facts. He was also well aware of the fact that the dynamite had been left lying around on the street, and was being used by the employees of the contractor, on the day of the accident, for blasting hardpan at a point a very few feet from the place of the accident. The inspector had, himself, on one occasion during the progress of the work, found a box of dynamite caps left unguarded in the middle of the road. He then reprimanded the foreman in charge of the work for the contractors. He knew that there was no regular place for the storage of the dynamite and caps, and paid no attention to where the dynamite was after the hours of work, or whether it was removed from the highway, or not, at the close of the day, leaving this entirely to the employees of the contractor.

Tommy Boggess, respondent, a boy of seven years, was dismissed from school on the afternoon in question at a little after three o'clock, and went home. After the men had left the work, he took his wagon and, accompanied by two little girls younger than he, went from his home to the corner, to play in the pipes. He saw the sack in the pipe, where it was plainly visible, crawled into the pipe, pulled the sack out, took out the sticks of powder and fuse and box of caps and, opening up the box which contained eight caps, consisting of small copper tubes containing highly explosive material, he proceeded, as he said, "to make a whistle" out of one of the caps. Being unable to take the material out, he went home, got a match and, not knowing the danger of the cap and being too young to realize the danger, lit the match, applied it to the cap, to "clean it out," as he said, with the result that it exploded. His hand was terribly mutilated, losing a thumb, index and third fingers of the left hand, his left eye was blown out, the right eye impaired, and he received other severe and painful injuries.

Through his guardian *ad litem,* he brought suit for forty thousand dollars, and upon trial the jury returned the verdict for twenty thousand dollars against appellant and by default against Bronson & Theusen. Bronson & Theusen, being insolvent, defaulted. Appellant alone defended.

The theory of the complaint was that the construction work was an attraction to children, causing them to play in the vicinity, which was known to the contractors, and that all the defendants, knowing this, were negligent in leaving the dynamite caps unguarded and unattended, with no warning sign in connection therewith, in a place easily and readily accessible, and particularly to respondent as a young child.

During the course of the trial, the court held that the firm of Bronson & Theusen was an independent contractor, but that the question of the county's liability still remained. The refusal of the court to dismiss the action or to grant judgment n. o. v. in favor of appellant, and in refusing to pass upon that part of the motion for a new trial relating to excessive damages and allowing excessive damages, are the errors upon which appellant relies for reversal.

 With the exception of the matter relating to the excessive damages, the only question argued by appellant, as stated by it, is: "When is a municipal corporation liable for the torts of an independent contractor?"

Although not cited by either party, the liability of a county as a subdivision of a state has become generally well established in this state by reason of the operation of the law giving to county commissioners the control and management of county roads and highways (Rem. Comp. Stat., § 6398), and by another section of the code (§ 951), providing that an action may be maintained against a county for an injury to the

rights of the plaintiff arising from the acts or omissions of such county, although none existed at the common law. *Kirtley v. Spokane County,* 20 Wash. 111, 54 Pac. 936.

Where such duty and resultant liability extends to counties, the same rules governing liability for negligence extends to them as to towns and cities. *Park v. Board of Com'rs of Adams County,* 3 Ind. App. 536, 30 N. E. 147; *County Commissioners of Anne Arundel County v. Duvall,* 54 Md. 350.

In this state the law is well settled that there is a positive and continuous duty upon the part of municipalities, having control of streets and public ways, to use reasonable care at all times to keep the streets safe for the public.

In *Drake v. Seattle,* 30 Wash. 81, 70 Pac. 231, 94 Am. St. 844, we quoted approvingly from Dillon's Municipal Corporation (4th ed.), § 1047, to the effect that, where the duty of maintaining the streets in a safe condition for public travel and use is specifically imposed on the corporation, it rests primarily, as respects the public, upon the corporation, and the obligation to discharge that duty cannot be evaded, suspended, or cast upon others, by any act of its own.

We accordingly held in that case that, although the work in progress was a public work, carried on by independent contractors, the duty to properly guard the excavation rested primarily upon the city, and that the city could not delegate that duty so as to escape liability by its nonperformance as against any person lawfully travelling upon the street.

In *McClammy v. Spokane,* 36 Wash. 339, 78 Pac. 912, where a permit had been granted for the making of certain changes in the street by the permittee under the supervision and direction of the city engineer, the work being done through the permits on contract, we

held that the duty to properly guard the excavation, although it was carried on by independent contractors, rested primarily upon the city; that it could not delegate that duty so as to escape liability for its nonperformance as against any person lawfully travelling upon the street. We there observed that,

"Under any and all circumstances it [the city] is liable for such injuries arising from defects in public walks as the exercise of ordinary care upon the part of its authorities would prevent, . . ."

The rule so established in this state is supported with great unanimity by all the text-writers and courts, with but few exceptions. We find the rule thus stated in Thompson on Negligence, vol. 5, § 5956, p. 423:

"This duty of exercising reasonable care to the end that its highways, streets, sidewalks, and cross-walks shall be reasonably safe for ordinary travel, is an absolute duty, in the sense that the municipal corporation cannot devolve it upon others and require the injured traveller to seek his redress from them. The duty, and the liability which accompany it, are primary."

Section 6020, p. 492 reads:

"It follows that a city cannot shift the burden of keeping a street safe for public travel upon the contractor employed in grading and paving it, on the ground that he is an independent contractor, and that the rule of *respondeat superior* does not apply as between him and the city. And this is so, although the city has no control over the workmen of a contractor, and although it has, in its agreement with the contractor, stipulated that he shall be liable for accidents occasioned by his neglect."

Moll on Independent Contractors and Employers' Liability, § 141, p. 248, thus states the rule:

"If the act or omission of the independent contractor is a violation of some primary or inalienable duty of the city, such as that of keeping its streets in a reasonably safe condition for public travel, the

city will be liable therefor. The duty of a city to exercise reasonable care to the end that its highways, streets, sidewalks, etc., shall be reasonably safe for ordinary travel, is absolute in the sense that it is primary and can not be delegated so as to absolve it. . . ."

See, also, McQuillin on Municipal Corporations (1928 ed.), vol. 6. § 2833; 45 C. J. subd. 67, p. 696.

▮ Appellant insists that the storage or abandonment of the blasting material in the tile by an employee of the contractor at the close of the day's work, under the circumstances shown by the evidence, was an act so collateral and incidental to the main work of the construction of the highway as to relieve appellant of liability.

Texts and cases are cited, principally involving private contracts between private employers and contractees not involving the primary and unavoidable duties of a public corporation to keep its streets or highways reasonably safe for public travel.

A typical case cited is *Johnston v. Seattle Taxicab & Transfer Co.*, 85 Wash. 551, 148 Pac. 900; and the text of 14 R. C. L., § 23, p. 86 *et seq.*; 19 R. C. L., § 416, p. 1140; 13 R. C. L., p. 332 *et seq.*, and 43 C. J. 920 *et seq.*

Reliance is placed upon our case of *Wilton v. Spokane*, 73 Wash. 619, 132 Pac. 404, L. R. A. 1917D 234. That was a case where a contractor left an unexploded charge of dynamite in the rock beneath the surface of the street, and the work had been accepted by the city. Some months later a licensee of the city began to erect poles along the margin of the improved street, for lighting purposes. While the employees of this licensee were drilling for the purpose of putting in a blast in one of the holes, the drill encountered the unexploded blast left in the rock by the prior contractor, causing it to explode.

We there observed that the leaving of an unexploded blast of dynamite in the rock below the surface of a street was not an incident to the work of blasting rock to make a grade for a street. There was no evidence in the case that the city had knowledge of the existence of the unexploded blast, and this court, of course, concluded that by no sort of diligence that the city could have exercised would it have become acquainted with that fact. But we also there stated that the city would have been liable had the contractor left the dynamite on the surface of the street in the travelled part of the roadway, on leaving the work, and it was liable for injuries resulting therefrom in case it knew of its being so left or by the exercise of reasonable diligence could have known. That was a case where there was no duty imposed upon the city to provide a reasonably safe place for the employees of the subsequent licensee to work.

Nor can we see the applicability of such cases as *Spokane v. Crane Co.,* 98 Wash. 49, 167 Pac. 63; *Curtis v. Puget Sound Bridge & Dredg. Co.,* 133 Wash. 323, 233 Pac. 936, and *Cle Elum v. Yeaman,* 145 Wash. 157, 259 Pac. 35. In none of those cases was the primary duty of a public municipality to keep its highway in reasonably safe condition, involved.

In the present case the negligence of the contractor's foreman was manifest, and so gross as to be almost wanton. Of the gross negligence of the foreman of the contractor, the inspector of the county had full knowledge.

As to the degree of care required of those having possession or control of dangerous explosives, this court in *Olson v. Gill Home Investment Co.,* 58 Wash. 151, 108 Pac. 140, 27 L. R. A. (N. S.) 884, quoted approvingly from *Mattson v. Minnesota & N. W. R. Co.,* 95 Minn. 477, 104 N. W. 443, as follows:

"The degree of care required of persons having the possession and control of dangerous explosives, such as firearms or dynamite, is of the highest. The utmost caution must be used in their care and custody, to the end that harm may not come to others from coming in contact with them. The degree of care must be commensurate with the dangerous character of the article [authority] and is greater and more exacting as respects young children. As to such, the care required to be exercised is measured by the maturity and capacity of the child. [Authority] What would constitute reasonable care with respect to adults might be gross negligence as applied to a young child. [Authority] The case at bar, within these rules, is even stronger than the so-called 'turntable cases.' There is nothing so attractive to young boys as articles of an explosive nature, and the greater the volume of sound that may be produced therefrom the greater the attraction. As compared with an ordinary turntable, dynamite is vastly more attractive, and far more dangerous. Young children are incapable of comprehending the dangers in handling or exploding the same, and their natural instincts urge them into experiments with it whenever it comes within their reach. In view of these considerations, the rule of law imposed upon him who possesses such dangerous articles should be more exacting than in the case of a turntable; . . ."

In the *Olson* case, the injured boy was about thirteen years of age and was a trespasser upon the premises where dynamite caps and fuse were found. In the present case, the boy was of such tender years as to be deemed incapable in law of contributory negligence; was not a trespasser nor an invitee, nor a licensee, but one having an absolute public right to the use of the highway, as much as any adult. It was his accustomed and only route of travel to his school. And such extremely dangerous instrumentalities as dynamite and dynamite caps, which as all courts declare are perilously attractive to children, were left in a pipe on the

surface of the highway, not hidden, but exposed in just such a way as to arouse the curiosity of young children, and one in which the children, including the respondent, were in the habit of playing. This fact the agent of the county knew, or should have known. As inspector of that work for the county, ordinary prudence dictated that he should direct the contractors to provide a safe place to store such explosives, or take them away from the work when not in use.

Applying the rule which is almost universally applied to cities and towns as to the liability, we are thoroughly convinced that the county cannot escape liability under such circumstances by having made an independent contract for the construction work.

As to the excessiveness of the verdict, the injuries to respondent were not only very painful, but are permanently disabling to the extent, as testified by an expert in that line, of seventy-five per cent of his future earning capacity throughout life. His life expectancy is more than fifty years.

We should be unwilling to say that the loss of one eye, the impairment of the other and the practical loss and mutilation of one hand, together with the pain and suffering that was undoubtedly concurrent with the injuries, did not amount to as much as twenty thousand dollars. At any rate we do not think it was in any way excessive. We think the award of damages was well within the evidence and our decisions. *McCreedy v. Fournier*, 113 Wash. 351, 194 Pac. 398, and *Ekeberg v. Tacoma*, 142 Wash. 240, 252 Pac. 915.

The judgment is affirmed.

MITCHELL, C. J., PARKER, and MAIN, JJ., concur.